**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA

v.

MASOUD SOLEIMANI,
MAHBOOBE GHAEDI, and
MARYAM JAZAYERI

CRIMINAL CASE NO.

1:18-cr-00216-ELR-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Masoud Soleimani ("Soleimani"), Mahboobe Ghaedi ("Ghaedi"), and Maryam Jazayeri ("Jazayeri"), collectively referred to as "defendants," are charged in a two-count superseding indictment with knowingly and willfully conspiring to violate the Iranian Transactions and Sanctions Regulations ("ITSR"), in violation of 50 U.S.C. § 1705 and 31 C.F.R. §§ 560.203 and 560.204, and knowingly and willfully attempting to export biological items from the United States to Iran without first obtaining the required authorization from the United States Department of Treasury's Office of Foreign Assets Control ("OFAC"), in violation of 50 U.S.C. § 1705, 31 C.F.R. §§ 560.203, 560.204, and 18 U.S.C. § 2.  [Doc. 16].[1]

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

Defendants Jazayeri and Ghaedi have filed motions to sever, [Docs. 92 & 93], which the government opposes, [Doc. 100], and each defendant has filed a motion to dismiss the superseding indictment, [Docs. 77, 87, & 88],[2] to which the government has filed a consolidated response, [Doc. 99].[3]   Defendant Jazayeri also has filed a motion to suppress statements, [Doc. 86], and following an evidentiary hearing on June 6, 2019,[4] the parties filed post-hearing briefs, [Docs. 114 & 116].[5]   For the reasons that follow, it is **RECOMMENDED** that Jazayeri and Ghaedi's motions to sever, [Docs. 92 & 93], defendants' motions to dismiss, [Docs. 77, 87, & 88], and Jazayeri's motion to suppress statements, [Doc. 86], be **DENIED**.

---

[2] Ghaedi also has moved to adopt Jazayeri's motion to dismiss on the basis of unconstitutional vagueness, [Doc. 94], which is **GRANTED**.

[3] Defendants filed replies in support of their motions, [Docs. 104, 109, & 111].

[4] See [Doc. 113] for a transcript of the evidentiary hearing.   Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at __)."   In addition, the government submitted exhibits at the evidentiary hearing, which will be referred to as "(Gov't Ex. __)."

[5] Soleimani and Ghaedi have moved to adopt Jazayeri's reply in support of her motion to dismiss the indictment, [Docs. 107 & 110], while Jazayeri has moved to adopt Soleimani and Ghaedi's motions to dismiss and replies in support of the motions, [Doc. 112].   Defendants' motions to adopt, [Docs. 107, 110, & 112], are **GRANTED**.

## I.  INTRODUCTION

On October 24, 2018, a federal grand jury in the Northern District of Georgia returned a superseding two-count indictment against defendants.   [Doc. 16].  According to the allegations of the superseding indictment, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, "conferred upon the United States President the authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States," and that by Executive Order No. 12170, issued on November 14, 1979, President Jimmy Carter "found that 'the situation in Iran constitute[d] an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat.'"  [Id. ¶¶ 1-2 (last alteration in original)].   Subsequently, on March 15 and May 6, 1995, President William J. Clinton issued Executive Order Nos. 12957 and 12959, which prohibited "the exportation, re-exportation, sale or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, [] Executive Order No. 13059 [was issued], clarifying the previous orders," and these "Executive Orders authorized the United States Secretary of Treasury to promulgate rules and regulations necessary to carry

out the Executive Orders." [Id. ¶ 3]. "Pursuant to this authority, the Secretary of the Treasury promulgated the [ITSR] in October 2012." [Id.].

The superseding indictment further explains that 31 C.F.R. § 560.204 of the ITSR prohibits:

> the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, re-exportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from [OFAC].

[Id. ¶ 4]. It also "forbid[s] a United States person from engaging in any transaction or dealing in or related to goods, technology or services that are exported, re-exported, sold or supplied, directly or indirectly, to Iran or the Government of Iran, without having obtained a valid OFAC license," as well as prohibiting "transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate, the ITSR." [Id. ¶¶ 5-6 (citing 31 C.F.R. §§ 560.203, 560.206)].

The superseding indictment alleges that Soleimani, who was located in Iran, "identified to defendant [Ghaedi], a Research Assistant Professor at a United States university during the [relevant] time period . . ., the biomedical material he wanted, including biomedical vectors and human growth factors," and that Ghaedi "obtained the requested biological material from U.S. companies on behalf of

[Soleimani]," which "were subsequently delivered to [Ghaedi] at the United States university."  [Id. ¶¶ 10(a)-(b)].  Thereafter, Soleimani allegedly "solicited from, and defendant [Jazayeri] agreed to carry, the biological material from the United States for delivery in the Islamic Republic of Iran without first obtaining the required licenses and authorizations from OFAC" and Ghaedi "agreed to and [] shipp[ed the] biological material intended for delivery to Iran to defendant [Jazayeri] at a U.S. address provided by [Jazayeri]."  [Id. ¶¶ 10(c)-(d)].  Jazayeri then allegedly "concealed [the] biological material within items that [she] intended to transport to Iran."  [Id. ¶ 10(e)].  The superseding indictment further alleges that "[a]t no time relevant . . . did the defendants . . . receive or possess a license or authorization from the OFAC to export goods . . . to the Islamic Republic of Iran."  [Id. ¶ 7].

Based on these allegations, the superseding indictment charges in Count One that, "[b]eginning in or about November 2014 and continuing through on or about September 6, 2016," the defendants "knowingly and willfully combine[d], conspire[d], confederate[d], and agree[d] with one another and with others known and unknown . . . to commit an offense against the United States[ by] export[ing] goods from the United States to the Islamic Republic of Iran without having first obtained the required licenses and authorizations from the OFAC."  [Id. ¶ 8].  Count Two charges:

Beginning in or about December 2015, and continuing through on or about September 6, 2016, in the Northern District of Georgia and elsewhere, the defendants . . . aided and abetted by one another, knowingly and willfully attempted to export United States origin goods from the United States to the Islamic Republic of Iran, those being vials containing biological material to include HGF - Hepatocyte Growth Factor, Activin A, SCF - Stem Cell Factor(s), Macrophage Colony Stimulating Factor(s), and bFGF - Basic Fibroblast Growth Factor, without having first obtained the required authorization from OFAC, in violation of the [IEEPA], Title 50 United States Code, Section 1705, and Title 31, Code of the Federal Regulations, Sections 560.203 and 560.204; and Title 18, United States Code, Section 2.

[Id. ¶ 12].  Defendants have filed several pretrial motions, [Docs. 77, 86, 87, 88, 92, 93], which are now fully briefed and ripe for ruling.

## II.   DISCUSSION

### A.   <u>Motions to Sever, [Docs. 92 & 93]</u>

Defendants Jazayeri and Ghaedi contend that their trials should be severed from each other as well as from Soleimani's trial under Federal Rule of Criminal Procedure 14(a).  [Docs. 92 & 93].  In particular, Jazayeri asserts that "[b]ased on the discovery that has been produced to date, it appears that the bulk of the Government's case against [her] relies on three kinds of evidence: the seizure of growth factors from [her] luggage as she attempted to board a connecting flight to Iran, statements [she] made to law enforcement regarding that seizure, and emails exchanged between [her] and [] Soleimani, her former professor and mentor in Iran," but that "she did not know taking growth factors to Iran was prohibited" and

that while "evidence against [her] at trial will generally be limited to her alleged attempt to take growth factors to Iran in 2016 and her communications with [] Soleimani regarding that conduct," the "Government's case against [] Soleimani and [] Ghaedi is significantly broader . . . and will feature substantially more evidence, including evidence that [] Soleimani and [] Ghaedi engaged in many other transactions that did not involve [her] and that they had considerably more knowledge regarding the prohibitions on exporting to Iran." [Doc. 92 at 1-3]. She therefore asserts that "[b]oth in quantity and quality, there is a stark contrast between the Government's evidence against [her] and its evidence against her co-defendants, creating a substantial risk that [she] will be unduly prejudiced if they are all tried together," and that a severance is warranted "[t]o avoid a verdict of 'guilt by association.'" [Id. at 4-5].

Ghaedi has also moved to sever her trial from her co-defendants, contending that "the Government's disclosures reflect a lengthy, in-depth investigation into and substantial evidence involving individuals other than [her]; namely, one or both of [her] co-defendants in this case and apparently several unindicted or separately indicted co-conspirators who have no direct ties to [her]," and that "[i]f offered as evidence in a joint trial, this type of material will rob [her] of her ability to present her defense and/or force her to testify at trial in violation of her Constitutional

rights," thereby "improperly shift[ing] the burden to her to establish her innocence." [Doc. 93 at 4 (emphasis omitted)].  In the alternative, Ghaedi requests that, if the Court is not inclined to sever at this stage of the litigation, that it "order the Government to identify the specific evidence they intend to use in their case-in-chief sufficiently in advance of trial for [] Ghaedi to renew this motion, as appropriate, prior to or during trial."  [Id. at 5].

In its consolidated response, the government argues that severance is not warranted in this case because Jazayeri and Ghaedi's "claims are merely assumptions"; "separate trials for jointly indicted defendants are generally disfavored"; "[i]t is insufficient for Ghaedi and Jazayeri to show that they may suffer some prejudice or that they may have a better chance for acquittal at a separate trial"; "differing levels of culpability among the defendants [do not] justify severance"; and "limiting instructions are the proper tool to prevent against prejudice that does not rise to the level of specific and compelling [prejudice]." [Doc. 100 at 2-4 (citations omitted)].  Ghaedi has filed a reply in support of her motion, in which she reiterates her previous arguments for severance, as well as her alternative request to preserve her right to raise the issue again should it not be ripe for consideration now.  [Doc. 111].

"[T]here is a preference in the federal system for joint trials of defendants who are indicted together." <u>United States v. Badiki</u>, CRIMINAL ACTION NO. 1:17-CR-342-ELR-AJB, 2018 WL 7283636, at *18 (N.D. Ga. Dec. 31, 2018), adopted by 2019 WL 397991, at *2 (N.D. Ga. Jan. 31, 2019) (citations omitted).  However, "[w]here claims are properly joined under Rule 8(a),[6] a court may nonetheless sever them based on Federal Rule of Criminal Procedure 14(a)," <u>United States v. Obie</u>, CRIMINAL CASE NO. 1:18-CR-007-ODE-JKL, 2018 WL 5045630, at *2 (N.D. Ga. Oct. 17, 2018) (footnote added), which provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).  "In deciding a motion for severance, the Court must balance the right of a defendant to a fair trial against the public's interest in efficient and economic administration of justice." <u>United States v. Denmark</u>, No. 205CR71FTM33DNF, 2005 WL 2755987, at *2 (M.D. Fla. Oct. 25, 2005) (citation and internal marks omitted).  "Relief under Rule 14 is available where there is a showing that a joint trial will cause the defendant undue prejudice." <u>United States v. Underwood</u>, 1:16-cr-306-WSD-2, 2017 WL 2875573, at *8 (N.D. Ga. July 5, 2017)

---

[6] Jazayeri and Ghaedi do not challenge their joinder under Rule 8 of the Federal Rules of Civil Procedure.  <u>See</u> [Docs. 92 & 93].

(citations omitted); see also United States v. Philpot, 1:15-cr-00028-WSD, 2017 WL 510892, at *2 (N.D. Ga. Feb. 8, 2017).  "More specifically, the Eleventh Circuit has interpreted Rule 14 to require a [d]efendant seeking severance to demonstrate specific and compelling prejudice arising from a joint trial." Denmark, 2005 WL 2755987, at *2  (citing United States v. Leavitt, 878 F.2d 1329, 1340 (11th Cir. 1989)).[7] "The burden on the defendant[s] to show that [they] will suffer prejudice is a heavy one."  United States v. North, 1:16-cr-309-WSD, 2017 WL 5185270, at *4 (N.D. Ga. Nov. 9, 2017) (citation omitted); see also United States v. Greenhill, CRIMINAL CASE NO. 1:18-CR-00108-MHC-JFK, 2018 WL 5659933, at *5 (N.D. Ga. Sept. 20, 2018), adopted by 2018 WL 5649898, at *1 (N.D. Ga. Oct. 31, 2018) (citations and internal marks omitted) ("This is a heavy burden, and one which mere conclusory allegations cannot carry.").  "Claimed prejudice can often be addressed by a court by appropriate limiting instructions to assure a jury will consider the charge sought to be severed separately and to not allow evidence or commission of the separate crime to be used in reaching a verdict on the other charge or charges for which the

---

[7] "Compelling prejudice occurs when the jury is unable to separately appraise the evidence as to each defendant and render a fair and impartial verdict."  United States v. Pasby, CRIMINAL ACTION FILE NO. 1:16-CR-145-TWT-JKL-22, 2017 WL 10402560, at *9 (N.D. Ga. Oct. 4, 2017), adopted by 2018 WL 4953235, at *1 (N.D. Ga. Oct. 12, 2018) (citation and internal marks omitted).

evidence is not relevant." Philpot, 2017 WL 510892, at *2 (citing United States v. Silien, 825 F.2d 320, 323 (11th Cir. 1987) (per curiam)).

The Eleventh Circuit has recognized the following types of prejudicial joinder that can require severance under Rule 14:

> (1) where the defendants rely on mutually antagonistic defenses; (2) where one defendant would exculpate the moving defendant in a separate trial, but will not testify in a joint setting; (3) where inculpatory evidence will be admitted against one defendant that would be inadmissible against the other; and (4) where the moving defendant will be prejudiced by "spillover" of evidence, which may prevent the jury from sifting through the evidence to make an individualized determination as to each defendant.

United States v. Stokes, CRIMINAL ACTION FILE NO. 1:14-CR-290-TWT-JKL-2, 2018 WL 2171473, at *4 (N.D. Ga. Apr. 18, 2018), adopted by 2018 WL 2151536, at *1 (N.D. Ga. May 10, 2018) (citation omitted). "Severance on any of these grounds is rarely granted, and is, in any event, committed to the sound discretion of the trial court; moreover, the denial of a motion for severance will not be reversed absent a clear abuse of discretion." Id. (citations and internal marks omitted).

Jazayeri and Ghaedi contend that they each will suffer prejudice by "spillover effect" "from the volume of evidence against co-defendants and unindicted or separately indicted co-conspirators" that "will almost certainly undermine the jury's ability to render a reliable, individualized judgment" in what they consider to be a complex case. [Doc. 93 at 12-13]; see also [Doc. 92 at 4-5]. They each contend that

11

the evidence the government will rely on to prove its case against them is slight in comparison to the evidence against the other, as well as the third co-defendant in this case, and that they each have a defense that the "others apparently may not," that they simply "didn't know."   [Doc. 92 at 2, 4-5; Doc. 93 at 10-11 (emphasis omitted)].   In short, Jazayeri and Ghaedi each contend that the "overwhelming volume and cumulative effect of evidence implicating others . . ., and the general similarity, history, and connectedness of [each of them] with [Soleimani] in this lawsuit, will weigh far too heavily on the minds of jurors as they deliberate and render a decision."   [Doc. 93 at 11; see also [Doc. 92 at 3-5].

Despite Jazayeri and Ghaedi's contentions, "severance is not required if some evidence is admissible against some defendants and not others and a defendant is not entitled to severance because the proof is greater against a co-defendant." United States v. Jones, No. 1:06-CR-140, 2007 WL 712420, at *4 (E.D. Tenn. Mar. 6, 2007) (citations and internal marks omitted); see also United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993) (citations omitted) ("[J]oint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible."); United States v. Mayfield, Criminal Action No. 2:16-CR-009-RWS-JCF, Criminal Action No. 2:16-CR-0010-RWS-JCF, 2018 WL 2189761, at *2 (N.D. Ga. Mar. 28, 2018), adopted by 2018 WL 2184080, at *1 (N.D. Ga.

May 11, 2018) (last alteration in original) (citation and internal marks omitted) (explaining that "[t]o the extent that [d]efendants [were] concerned about the jury's ability to distinguish between the evidence against each [d]efendant and that against his co-defendants, [a] disparity in the evidence admissible against one defendant as compared to his co-defendant is not a sufficient basis for a severance"); United States v. Hill, CASE NO. 5:17-CR-22 (MTT), 2018 WL 1441847, at *2 (M.D. Ga. Mar. 22, 2018) (citation omitted) ("holding a joint trial when there is voluminous evidence against other co-defendants does not deny defendants a constitutional right"). Moreover, "[i]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials," Harrison v. United States, 577 F. App'x 911, 914 (11th Cir. 2014) (per curiam) (unpublished) (citation and internal marks omitted), and "[t]his case simply is not one where the risk that the jury will not, or cannot, follow instructions is so great that it outweighs the interest in judicial economy served by a joint trial," United States v. Shoemaker, Criminal No. 2:11–CR–00038–NBB–DAS, 2012 WL 256520, at *5 (N.D. Miss. Jan. 27, 2012); see also United States v. Baradji, 479 F. App'x 301, 303 (11th Cir. 2012) (per curiam) (unpublished) (citation and internal marks omitted) ("[E]ven in the case of prejudicial spillover, a court's cautionary instructions will ordinarily mitigate the potential spillover effect of evidence of a codefendant's guilt.").  That is, "[d]espite

the massive amount of discovery that has been produced and the numerous pretrial motions that have been filed, this case remains a three-defendant case based on a straightforward [conspiracy] scheme," and "even if they had made a showing of a risk of prejudicial spillover evidence, [they] have not shown that a limiting instruction would not solve the problem, nor have they overcome the strong presumption that jurors are able to compartmentalize evidence and respect limiting instructions."   United States v. Holland, CRIMINAL ACTION NO. 1:17-CR-00234-AT-CMS, 2018 WL 8838855, at *4 (N.D. Ga. July 9, 2018), adopted by 2019 WL 2560019, at *27 (N.D. Ga. June 21, 2019); see also United States v. Glass, CRIMINAL ACTION FILE NO. 1:16-CR-145-TWT-JKL-5, 2018 WL 5091631, at *2 (N.D. Ga. Mar. 22, 2018), adopted by 2018 WL 5085682, at *1 (N.D. Ga. Oct. 18, 2018) (finding defendant's "concern that a jury [would] be unable to sift through the evidence at trial and make an individual determination of guilt as to him is too generalized to warrant a severance," since "[e]ssentially, he expresses a concern present in virtually any multi-defendant conspiracy case where the defendants have disparate levels of alleged participation").   Accordingly, the Court finds that defendants have failed to establish compelling prejudice such that the Court should exercise its discretion and sever their trials from each other and from the trial of their

co-defendant. Thus, severance is not warranted, and it is **RECOMMENDED** that Jazayeri and Ghaedi's motions to sever, [Docs. 92 & 93], be **DENIED**.

**B.**   **Motions to Dismiss the Indictment, [Docs. 77, 87, & 88]**

"The IEEPA allows the President to exercise authority to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat[.]" United States v. Groos, 616 F. Supp. 2d 777, 783-84 (N.D. Ill. 2008) (internal marks omitted) (quoting 50 U.S.C. § 1701(a)). "Specifically, it authorizes the President to regulate . . . prevent or prohibit . . . any . . . importation or exportation of . . . or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States," and further provides that any "[w]illful violations, or attempted violations, of any license, order, or regulation issued under the IEEPA lead to fines of not more than [$1,000,000], imprisonment of not more than [20] years, or both." Id. (citation and internal marks omitted) (quoting 50 U.S.C. § 1705(c)).

The ITSR, "codified at 31 C.F.R. part 560, implement a series of Executive orders that began with Executive Order 12613, which President Ronald Reagan

issued on October 29, 1987, prohibiting the importation of Iranian-origin goods and services." United States v. Akova, CRIMINAL ACTION NO.: 1:12-cr-00220-ELR-JKL-2, 2016 WL 7116127, at *2 (N.D. Ga. Oct. 28, 2016), adopted by 2016 WL 7118273, at *1 (N.D. Ga. Dec. 6, 2016) (citation omitted). "In 1995, President William J. Clinton declared that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and ordered sanctions prohibiting the export to, financing of, and investment in Iran." Id. (citations and internal marks omitted). "Pursuant to those orders, the Secretary of the Treasury issued the [ITSR]," id., which defendants are charged with violating, [Doc. 16].

In particular, 31 C.F.R. § 560.204 provides:

Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into

goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

31 C.F.R. § 560.204. The ITSR is "administered by the [OFAC], which authorizes and issues licenses for exports subject to the [ITSR]." United States v. Nazemzadeh, Criminal No. 11 CR 5726 L, 2014 WL 310460, at *3 (S.D. Cal. Jan. 28, 2014) (citation omitted). Subject to certain exceptions, the exportation of goods to Iran is prohibited unless expressly authorized by OFAC.[8] Section 560.203 prohibits "[a]ny transaction . . . that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part," as well as "[a]ny conspiracy formed to violate any of the prohibitions set forth in this part[.]" 31 C.F.R. § 560.203.

Defendants are charged with conspiring to violate the ITSR, in contravention of 50 U.S.C. § 1705 and 31 C.F.R. §§ 560.203 and 560.204, and with attempting to export goods to Iran without first obtaining the required authorization, in violation of 50 U.S.C. § 1705, 31 C.F.R. §§ 560.203 and 560.204, and 18 U.S.C. § 2. [Doc. 16].

---

[8] Relevant to the issues raised by defendants here, "[t]he prohibitions of §§ 560.204 and 560.206 do not apply to donations by United States persons of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering." 31 C.F.R. § 560.210(b). In addition, the version of 31 C.F.R. § 560.530 that was in effect at the time of the conduct alleged in the superseding indictment provided a general license for a United States person to be able to export certain medicine and medical supplies "to any individual or entity in Iran." 31 C.F.R. § 560.530(a)(3).

Defendants each have moved to dismiss the superseding indictment.  [Docs. 77, 87, & 88].  In particular, each moves to dismiss the superseding indictment for failure to state an offense, [Doc. 77 at 3-10; Doc. 87 at 5-11; Doc. 88 at 5-12], and Jazayeri and Ghaedi also have moved to dismiss the superseding indictment on the basis that the ITSR's licensing requirements are unconstitutionally vague, [Doc. 87 at 11-15]; see also [Doc. 94].  The government has filed a consolidated response in opposition, [Doc. 99], and defendants have filed replies in support of their positions, [Docs. 104, 109, & 110].

### 1.   *Failure to allege a Crime*

Defendants move to dismiss the superseding indictment for failure to allege a crime, [Doc. 77 at 3-10; Doc. 87 at 5-11; Doc. 88 at 5-12], asserting that they could "admit to the specific facts alleged in the [superseding] indictment and still be innocent of a crime as a matter of law," [Doc. 87 at 5].  In particular, defendants contend that the biological items at issue, which were "recombinant proteins . . . widely used in stem cell research for the development of medical applications and treatments worldwide," constituted "'medicines' [and/or 'medical devices'] covered by a general license . . . . [that] were not on the excluded medicines list" and "qualif[ied] as a 'drug,' as such word is defined by the Federal Food, Drug, and

Cosmetic Act"[9] and "were therefore exempted from any further OFAC licensure requirement by the general license provided at 31 C.F.R. § 560.530(a)(3)."  [Doc. 88 at 4, 6 (footnotes omitted)]; see also [Doc. 77 at 3-10; Doc. 87 at 8-11].  That is, defendants maintain that "as a matter of law, one does not need to obtain an OFAC license before exporting medical products, such as growth factors, to Iran" and that

---

[9] For purposes of a general license, "medicine" is defined as "an item that falls within the definition of the term 'drug' in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321) and that, in the case of an item subject to the [Export Administration Regulations ('EAR')], is designated as EAR99 or, in the case of an item not subject to the EAR, that would be designated as EAR99, if it were located in the United States."  31 C.F.R. § 560.530 (e)(2).  Drug is defined by the Federal Food, Drug, and Cosmetic Act as follows:

> (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C).

21 U.S.C. § 321(g)(1).  Medical devices are defined as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is[:] (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them, (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or (3) intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purpose through chemical action within or on the body of man . . . and which is not dependent upon being metabolized for the achievement of its primary intended purposes."  21 U.S.C. § 321(h)(1)-(3).

because the "growth factors in this case clearly fall under the legal definitions of 'medicine' and 'medical devices' [they were] thus exempted from ITSR's licensing requirements."  [Doc. 87 at 9-10].  Additionally, defendants rely on an "assessment by the FBI Scientific Response and Analysis Unit" that concluded the "'small volumes of growth factors in the vials . . . [were] consistent with basic research, proof-of-concepts studies or reverse engineering' and not any 'obvious nefarious uses,'" [Doc. 87 at 4 (emphasis omitted)], and "permitting the exportation of medicine to Iran allow[ed] the export of [these] biological materials . . . that [could] help treat/prevent disease and alleviate human pain and suffering," [Doc. 88 at 11]; see also [Doc. 77 at 5-6, 9].  Moreover, Jazayeri maintains that the ITSR "govern[s] the activities of relatively sophisticated individuals who are deliberately engaged in international commerce" and that it "was not intended to make it a federal crime for private individuals to bring items to their friends in foreign countries for non-commercial purposes," and that since the superseding indictment does not allege that she "possessed the growth factors . . . for a commercial purpose or that she or anyone else ever intended to introduce them into the stream of commerce in Iran," she "was not attempting to export" the growth factors, which "were no longer goods by the time they reached [her]" by "taking them to [] Soleimani in Iran during one of her family visits."  [Doc. 87 at 6-8 (internal marks omitted)].

20

The government presents several arguments in response to defendants' motions. [Doc. 99 at 3-17]. Specifically, the government asserts that the ITSR clearly prohibits the commercial transaction at issue here; OFAC is not "constrained by BIS's licensing determination," as set forth by the EAR; the ITSR regulation of items intended solely for medical research is not "contrary to the policy reason behind the Iran sanctions" but "is consistent with Congress' intent that the sanctions apply broadly;" and the proteins at issue are not "medicine," "medical devices," or "drugs" since the "manufacturer intended them to be used for research only and not for diagnostic purposes" and "thus, they are not subject to the exemption pursuant to § 560.530" and "required authorization from OFAC before their export to Iran," [Doc. 99 at 8-11, 13-16 (citations omitted)].   The government also cites a determination issued by OFAC on May 21, 2019, that the biological material at issue were "goods" that were "prohibited pursuant to the [ITSR]" and were "not regulated as drugs."  [Doc. 99 at 3-7; Doc. 99-1 at 2-3 (internal marks omitted)], Finally, the government asserts that the "resolution of [defendants'] claim [would] require[] . . . the court to make factual findings about whether the proteins satisfy the definition of 'medicine' and 'medical devices,'" but that a "question of fact should be resolved by a jury."  [Doc. 99 at 17 (citations omitted)].

"'An indictment is valid if it contains the elements of the offense intended to be charged.'"   United States v. Honeycutt, Criminal Action No. 2:12–CR–00022–RWS, 2014 WL 2003029, at *4 (N.D. Ga. May 14, 2014), adopted at *1 (quoting United States v. Williams, 181 F. App'x 945, 949 (11th Cir. 2006) (per curiam) (unpublished)).  "An indictment is sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense."[10]   United States v. Aydin, Criminal Case No. 1:12–CR–221–2–ODE–AJB, 2015 WL 927666, at *7 (N.D. Ga. Mar. 3, 2015), adopted at *5 (citations and internal marks omitted); see also Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]").

---

[10] "[I]f the indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which [they are] charged."   United States v. Slawson, Criminal Case No. 1:14–CR–00186–RWS–JFK, 2014 WL 5804191, at *5 (N.D. Ga. Nov. 7, 2014), adopted by 2014 WL 6990307, at *1 (N.D. Ga. Dec. 10, 2014) (citations and internal marks omitted).  And, "[i]n judging the sufficiency of an indictment, courts are cautioned to use a broad and enlightened standpoint of common sense and right reason rather than [a] narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding."   Id. (second alteration in original) (citation and internal marks omitted).

"'In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment, and more specifically, the language used to charge the crimes.'" Honeycutt, 2014 WL 2003029, at *4 (emphasis omitted) (quoting United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006)); see also United States v. Kopp, Criminal Action No. 1:12–CR–0269–RWS, 2014 WL 2154199, at *4 (N.D. Ga. May 21, 2014), adopted at *1 (alteration in original) (citation and internal marks omitted) ("It is well-settled that a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial."). "The Court must accept the facts in the indictment as true and may not rely on outside facts presented by defendants or facts that need to be developed at trial." United States v. Detling, CRIMINAL CASE NO. 1:18-cr-00309-LMM-LTW-1, 2019 WL 3006623, at *3 (N.D. Ga. Apr. 30, 2019), adopted, by 2019 WL 2284726, at *2 (N.D. Ga. May 29, 2019) (citations omitted). Moreover, "[i]n resolving a pretrial motion to dismiss, the court is not determining whether the [g]overnment's evidence is sufficient to find [defendants] [] guilty of the charge[s] in the [superseding] indictment or whether the [g]overnment will carry its burden of proof at trial but only whether there is a legal infirmity or defect in the indictment." United States v. Baldwin, CRIMINAL CASE NO. 1:17-CR-00276-ELR-JFK, 2018 WL 4520210, at *3

(N.D. Ga. May 30, 2018), adopted by 2018 WL 3388137, at *3 (N.D. Ga. July 12, 2018) (citations omitted).

The superseding indictment alleges that defendants, aided and abetted by each other, knowingly and willfully attempted and conspired to export United States goods from the United States to Iran without having first obtained the required approval from OFAC, in violation of 50 U.S.C. § 1705, 31 C.F.R. §§ 560.203 and 560.204, and 18 U.S.C. § 2.  [Doc. 16].  There is no doubt that the superseding indictment "contain[s] the elements of the offense intended to be charged, and sufficiently apprise[s] [] defendant[s] of what [they] must be prepared to meet." Baldwin, 2018 WL 4520210, at *3 (citation and internal marks omitted).  Although defendants maintain that the "goods" at issue were exempted from the licensure requirement as a "medicine," "medical device," or "drug," and that the superseding indictment therefore fails to state an offense, [Doc. 77 at 3-10; Doc. 87 at 5-11; Doc. 88 at 5-12], these arguments may be summarily addressed as it is clear that the government "is not required to prove its case in the indictment," but "[o]nly when an indictment fails to charge all essential elements of a crime must it be dismissed," United States v. Staph, Criminal No. 09–42, 2010 WL 2884694, at *3 (W.D. Pa. July 21, 2010) (citation omitted), and here, the superseding indictment sufficiently alleges that defendants knowingly and willfully conspired and attempted to export United

States goods from the United States to Iran without obtaining prior approval from OFAC, in violation of the embargo, see [Doc. 16]. Indeed, "[a]n indictment must be read in its entirety and construed with 'common sense and practicality,'" United States v. Awad, 551 F.3d 930, 936 (9th Cir. 2009) (citation omitted), and "[i]n criminal proceedings, there is no summary judgment mechanism," nor "do the rules provide for a pre-trial determination of sufficiency of the evidence," since, as the government correctly points out, "the resolution of factual questions is the sole province of the jury," Baldwin, 2018 WL 4520210, at *3 (citation and internal marks omitted); see also [Doc. 99 at 17].

Furthermore, "an indictment need not refute potential defenses in order to be valid, and the Court cannot make inferences regarding what the evidence will show at trial on a motion to dismiss." United States v. Rowland, Criminal No. 3:14cr79 (JBA), 2014 WL 3341690, at *10 (D. Conn. July 8, 2014) (citation omitted). In the present case, the superseding indictment specifically alleges that defendants, aided and abetted by each other, knowingly and willfully conspired and attempted to export goods to the embargoed country of Iran without obtaining prior authorization from OFAC. [Doc. 16]. The superseding indictment specifically details the manner and means of the conspiracy and provides the date range that the conduct at issue allegedly occurred, see [id.], and "[i]t is beyond question that

25

[defendants have] understood all along that [they are] charged with exporting [biological materials to Iran without export authorization from OFAC]." United States v. Alavi, No. CR 07–429–PHX–NVW, 2008 WL 1989773, at *3 (D. Ariz. May 5, 2008).  In short, "[d]efendants do not assert that the [superseding] indictment lacks sufficient detail to apprise them of the charges or to defend against double jeopardy," and "although they contend that the [superseding] indictment fails to state a claim against them, they do not contend that essential elements of the charged crimes are missing from the language of the indictment," but "[r]ather, [d]efendants make various arguments about why the [g]overnment's case against them fails as a matter of substantive law," which may prove to "carry the day at the close of the evidence either with a jury or with the Court in the context of a motion for a judgment of acquittal," but "are not persuasive in the context of challenging the [superseding] indictment." United States v. Rhame, CRIMINAL ACTION NO. 1:16-CR-67-SCJ-CMS, 2017 WL 9474217, at *4 (N.D. Ga. Jan. 31, 2017), adopted by 2017 WL 5591273, at *8 (N.D. Ga. Nov. 20, 2017).  The Court's determination is centered around "whether the [superseding] indictment is legally sufficient on its face," and defendants' "arguments do not address such pleading deficiencies, but rather present various theories of defense." Id. (internal marks omitted).  Despite defendants' arguments, the Court finds that the superseding indictment "sets forth

the essential elements of [the crimes charged] and provides sufficient factual detail to provide notice of the basis for the charge[s] and to enable [d]efendants to protect against double jeopardy," and "[w]hether a conspiracy in fact existed [or whether the proteins at issue were exempted from the licensing requirement are] [] question[s] for the jury." Id. at *6. Accordingly, it is **RECOMMENDED** that the pending motions to dismiss for failure to allege an offense, [Docs. 77, 87, & 88], be **DENIED**.

### 2.   *Unconstitutionally Vague Statute*

Jazayeri and Ghaedi move to dismiss the indictment, arguing that "the ITSR's prohibitions and license exceptions are unconstitutionally vague as applied to the alleged offense of taking a small quantity of medical growth factors to Iran for non-commercial purposes." [Doc. 87 at 11]; see also [Doc. 94]. In particular, they assert that "[e]ven with [a] specific intent requirement, the ITSR's export prohibitions are vague as applied here because it is unclear to an ordinary person what items they can and cannot take to Iran, and for what purposes"; the "ITSR's licensing requirements and exemptions are also vague as applied to the growth factors in this case"; and "the ITSR's use of the words 'exportation' and 'goods' and its specific licensing requirements and general license exemptions under § 560.530" are "vague and ambiguous as applied to this case." [Doc. 87 at 11-14]. In response, the

27

government contends that Jazayeri and Ghaedi, each of whom "earned a PhD Degree," were born in Iran, came to the United States approximately ten years ago, and traveled between the United States to Iran during this time, "are well-educated, intelligent people who are reasonably expected to know about the trade sanctions between the U.S. and their birth country" and that their arguments that the indictment is "void for vagueness as applied to them" should be rejected.  [Doc. 99 at 21-22].

"'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.'"  Allied Veterans of World, Inc.: Affiliate 67 v. Seminole Cty., 783 F. Supp. 2d 1197, 1206 (M.D. Fla. 2011) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)).  "A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000) (citation omitted); accord United States v. Williams, 553 U.S. 285, 304 (2008).  However, "[t]here is a strong presumption that statutes passed by Congress are valid," United States v. Carver, 422 F. App'x 796, 800 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted), and "because [d]efendants' void for vagueness challenge

does not raise a First Amendment issue, it must be evaluated only as applied, in the light of the facts of the case at hand," United States v. Maughon, Criminal Action No. 1:11–CR–028–TWT–ECS, 2011 WL 3489973, at *3 (N.D. Ga. June 21, 2011), adopted by 2011 WL 3489948, at *1 (N.D. Ga. Aug. 9, 2011) (citations omitted). Furthermore, "[t]he constitutionality of an allegedly vague statutory standard is closely related to whether the standard incorporates a requirement of *mens rea*," and the Supreme Court has stated:

> A statutory requirement that an act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain.  But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware. . . .

Id. (quoting Screws v. United States, 325 U.S. 91, 101-102 (1945) (Douglas, J. concurring)).  "Supreme Court precedent makes clear that courts should use the void for vagueness remedy sparingly," as "under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws."  United States v. Gerlay, No. 3:09–cr–00085–JWS–JDR, 2009 WL 4897748, at *1 (D. Alaska Dec. 11, 2009) (footnote and internal marks omitted).[11]

---

[11] Indeed, "[a] court may not invalidate application of a statute under the void-for-vagueness doctrine simply because there is some degree of ambiguity in the provisions of the statute," United States v. Ortiz, 738 F. Supp. 1394, 1397 (S.D. Fla. 1990), and "[t]he Supreme Court has rarely held federal statutes to be void for vagueness," KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner, 647 F. Supp. 2d 857, 893 (N.D. Ohio 2009) (citation omitted).

As the government points out, "the prohibited conduct is clear" in that "[w]illfully exporting any good to Iran is illegal under the ITSR." [Doc. 99 at 19 (citation omitted)]. And, "[d]efendants' professed inability to comprehend jargon such as '[goods]' and '[]export[ation]' rings hollow," as do their contentions that "the web of statutes, executive orders, and regulations [are] too complex for the average person to understand what is permitted." United States v. Quinn, 401 F. Supp. 2d 80, 100 (D.D.C. 2005); see also [Doc. 87 at 12, 14]. "The strong presumptive validity that attaches to an Act of Congress has led [the Supreme] Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." United States v. Nat'l Dairy Prod. Corp., 372 U.S. 29, 32 (1963) (citations omitted). In fact, Jazayeri even concedes "that this Court has rejected a vagueness challenge to the ITSR on at least one previous occasion," [Doc. 87 at 13 (citing Akova, 2016 WL 7116127, at *4-5)]; see also United States v. Geissler, 731 F. Supp. 93, 100 (E.D.N.Y. 1990) ("A review of the precedents reveals that 'as applied' vagueness challenges to export licensing criminal statutes and regulations have been rejected by federal courts."), and her attempt to distinguish the facts of this case is simply unpersuasive. Indeed, Jazayeri's contention is "unconvincing . . . that no one could understand that it is illegal for a[n individual] to export . . . materials from the United States to [] Iran[.]" Akova, 2016 WL 7116127, at *5; see also Nazemzadeh,

2014 WL 310460, at *10 (finding "the licensing scheme promulgated by OFAC under the authority granted the President through IEEPA provide[d] sufficient notice to defendants to protect their due process rights").

"In addition, the penalty provision . . . contains a scienter requirement, which may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that [her] conduct is proscribed." Akova, 2016 WL 7116127, at *5 (citations and internal marks omitted). That is, "[i]f the government fails to prove beyond a reasonable doubt that [Jazayeri and Ghaedi] 'willfully' conspired to commit the alleged violation of the IEEPA and IT[S]R or 'willfully' attempted to commit the alleged violation of the IEEPA and IT[S]R, then the jury must acquit [them] of those charges," but their "self-professed ignorance of the law does [not] render the statute unconstitutional." Id. (citation omitted). Instead, "this is a case where ignorance of the law is a defense; the inability to appreciate the meaning of the law negatives the *mens rea* required for conviction, and defendants are free to argue that to the jury," thereby alleviating any "concerns about defendants being convicted under a law that they could not have reasonably understood[.]" Quinn, 401 F. Supp. 2d at 100-01 (emphasis and citation omitted). Accordingly, it is **RECOMMENDED** that Jazayeri and Ghaedi's motions to dismiss the indictment on grounds of unconstitutional vagueness, [Docs. 87 & 94], be denied.

**D.      Motion to Suppress Statements, [Doc. 86]**

Jazayeri contends that the statements she made at the airport on September 6, 2016, were obtained in violation of her Miranda[12] rights.  [Doc. 86]; see also [Doc. 114 at 5-6].  She also contends that the post-arrest statements she made on November 5, 2018, are due to be suppressed because she invoked her right not to talk to law enforcement authorities and the government cannot establish that she knowingly and voluntarily waived this right.   [Doc. 86]; see also [Doc. 114 at 6-10].  The government responds that Jazayeri's September 6, 2016, statements are admissible because Miranda warnings were not required since she was not in custody, [Doc. 116 at 8-14], and that her November 5, 2018, statements were made after she knowingly and intelligently waived her Miranda rights and are admissible because she never unequivocally invoked her right to counsel, [id. at 14-22].[13]  The Court will address each of these arguments in turn.

---

[12] See Miranda v. Arizona, 384 U.S. 436 (1966).

[13] Jazayeri also made statements on February 13, 2018; however, the government concedes that it does not intend to use these statements in its case-in-chief.  (Tr. at 2); see also [Doc. 114 at 2-3].  Accordingly, Jazayeri's motion to suppress with regard to these statements is moot.

### 1.     Statement of Facts

Special Agent John Conley ("Agent Conley") of the United States Department of Commerce's Bureau of Industry and Security ("BIS")[14] became involved in an investigation of defendant Soleimani upon becoming "aware that he was trying to procure items from the [United States] that may require an export license," and that defendant Jazayeri "may be the person that [was] taking those items out of the [United States] when she departed from Atlanta." (Tr. at 5, 38). During the course of the investigation, Agent Conley confirmed that Jazayeri was scheduled to depart the United States from Atlanta's Hartsfield-Jackson International Airport on September 6, 2016, with her final destination being Tehran, Iran. (Tr. at 5-7, 38-39).[15]

On September 6, 2016, Agent Conley, who was dressed in civilian clothing and was armed with a weapon that was not visible, arrived at the airport and met

---

[14] The BIS is charged with enforcing "the export administration regulations and [ ] [ensuring] compliance with those regulations at any location something may be exported from the United States," as well as "enforcing the Department of Treasury sanctions to include Iran." (Tr. at 3). The BIS also has border authority, which "includes [] inspection, detention, searching, seizing and interviewing concerning commodities being exported [from the United States]." (Tr. at 4). The BIS's authority only extends to goods being exported at the border, whereas the authority of the United States Department of Homeland Security's Customs and Border Patrol ("CBP") extends to "inbound and outbound enforcement of any violations at the border." (Tr. at 4-5).

[15] During his investigation, Agent Conley also learned that Jazayeri was born in Iran, had obtained a degree in biological sciences, came to the United States about ten years ago, and that she was previously employed in a scientific research position at a university in Kentucky. (Tr. at 12-13).

with a Federal Bureau of Investigation ("FBI") agent, who also was dressed in civilian clothing, and a CBP officer, who was wearing a CBP uniform, and after verifying that Jazayeri was waiting to board the airplane in the passenger waiting area at the gate, they moved into the jetway, and the CBP officer began conducting outbound inspections of random passengers, which included verifying the passenger's biographical information listed in the individual's passport and asking whether the individual was "taking anything out of the [United States] and similar questions." (Tr. at 6-8, 39). At this time, the CBP officer asked a passenger to step out of line and follow him into a "ten-by-ten" interview room that was attached to the jetway in the boarding area. (Tr. at 7-9). Thereafter, the CBP officer returned to the jetway and encountered Jazayeri and her two-year old son as they were about to board the airplane, and he asked Jazayeri for her passport and then he, along with Agent Conley and the FBI agent, escorted her and her son into the same interview room as the previous passenger. (Tr. at 6, 9-10, 39-40).

In the interview room, the CBP officer and Agent Conley verified Jazayeri's biographical information in her passport and then asked her about her destination, the purpose of her trip, whether she had any checked baggage, and whether "she was going to be leaving the United States with any medical or research items." (Tr. at 10-11, 40-41). Jazayeri responded that she was not taking any medical or research items with her, and this interview lasted "less than ten minutes." (Tr. at 11-12, 14).

34

Following the interview, Jazayeri and her son were allowed to board the plane and depart the United States. (Tr. at 14).[16]

On November 5, 2018, at approximately 8:00 a.m., Agent Conley, who was dressed in "khakis, a shirt and police identified body armor," along with three BIS agents and one FBI agent, who were similarly dressed, went to Jazayeri's residence in Louisville, Kentucky, and set up surveillance in order to execute an arrest warrant. (Tr. at 14-15, 28, 31, 45-46). As the agents approached Jazayeri's residence, which was at approximately 9:00 a.m., Agent Conley had his weapon drawn and pointed toward the ground, while the other agents knocked on the door and announced their presence and that they had an arrest warrant. (Tr. at 15, 46-47, 53). Jazayeri and her husband opened the door, and the agents entered the residence and first conducted a security sweep of the home while Jazayeri, who was allowed to get her son from the back bedroom, and her husband waited in the living room. (Tr. at 16, 47). At the conclusion of the security sweep, which lasted about twenty minutes, BIS Special Agent Ariel Leiwand ("Agent Leiwand"), Agent Conley, and FBI Special

---

[16] Law enforcement officers spoke to Jazayeri in English and she did not indicate that she had any trouble understanding them and she provided responsive answers to their questions. (Tr. at 13). Jazayeri did not appear to be under the influence of any drugs or alcohol, and she displayed a "relaxed" demeanor during the interview. (Tr. at 13-14). Jazayeri was not advised of her <u>Miranda</u> rights during this interview, nor was she advised that she was under arrest or told whether she was free to leave or not, and she was not threatened or coerced in any way, nor was she promised anything. (Tr. at 13, 34-35, 40).

Agent Matthew Martin ("Agent Martin") holstered their weapons and asked Jazayeri to sit at the table in the dining room so they "could explain about the arrest and provide her with her rights." (Tr. at 16-18, 27, 33, 45, 47-48).[17]

As soon as Jazayeri and the three agents were seated at the dining table, the agents provided Jazayeri the arrest warrant and her <u>Miranda</u> rights, which were printed in both English and Farsi and read to her in English. (Tr. at 18, 20, 29, 31, 35-36, 43-44, 48-49; Gov. Exs. 1 & 2; Gov. Ex. 3 at 1:25-1:59). Specifically, Agent Leiwand advised Jazayeri that she had the right to remain silent and that any statements she made could be used against her. (Tr. at 20-21, 35-36, 48; Gov. Exs. 1 & 2; Gov. Ex. 3 at 1:25-1:59). He further advised Jazayeri that she had the right to speak to an attorney, to have one present during the questioning, to have one appointed for her if she could not afford one, and, in the event she proceeded with questioning without an attorney, to stop answering questions at any time. (Gov. Exs. 1 & 2; Gov. Ex. 3 at 1:25-1:59). Jazayeri signed her name on the pre-printed <u>Miranda</u> forms, acknowledging that she had been provided her rights in English and in Farsi and that she understood what her rights were, and she then signed the waiver of rights portion, which states:

---

[17] The dining room was attached to the living room and Jazayeri's husband and son remained in the living room with one agent while another agent remained outside in her vehicle parked in front of the house and the other three agents spoke with Jazayeri in the dining room. (Tr. at 17-18, 29-30).

> I am willing to discuss subjects presented and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

(Tr. at 20-21, 48-49; Gov. Exs. 1 & 2; Gov. Ex. 3 at 3:39-4:10, 4:47-7:05).  After advising Jazayeri of her rights, she agreed to waive her rights and speak with the agents and following questions pertaining to Jazayeri's biographical information,[18] she proceeded to make certain incriminating statements.  (Tr. at 18, 22, 49; Gov. Ex. 3).[19]

Approximately forty-one minutes into the interview, Jazayeri stated that she wanted to ask a question about her choice of either not talking or talking in the presence of her attorney and whether this conversation could be in the presence of an attorney or should be in the presence of an attorney because she did not know.  (Tr. at 22-24, 35-36, 51-52, 54-56; Gov. Ex. 3 at 41:36-41:55).  Agent Martin advised Jazayeri that it was her decision and that she had a right to have an attorney present with her during questioning at any time.  (Tr. at 23-24, 51-52; Gov. Ex. 3 at 41:55-42:07).  Jazayeri then said that her attorney was not available to come, at which time Agent Martin advised her that they could "certainly get [her] a lawyer."  (Gov. Ex.

---

[18] Jazayeri stated that she is a United States citizen, that she first came to the United States in 2002 or 2003, that she traveled back to Iran on at least two occasions between 2003 and 2010, and that in 2010, she received a post-doctorate fellowship at the University of Louisville in Kentucky and moved to that area.  (Gov. Ex. 3 at 7:33-9:17).

[19] The interview was audio recorded in its entirety.  See (Tr. at 19; Gov. Ex. 3).

3 at 42:07-42:22). Agent Conley then explained to Jazayeri that she had two options as she either could request an attorney and stop speaking with them, which was her right, or she could continue to speak with them and cooperate, and they would relay that to the prosecutors and the judge, but that it was her decision and she could not ask the agents for advice. (Tr. at 23-24; Gov. Ex. 3 at 42:24-43:39). The agents asked Jazayeri if she wished to continue with the interview without an attorney, and Jazayeri responded affirmatively and stated that she had "nothing to hide." (Tr. at 24-25, 52; Gov. 3 at 43:40-43:48). Jazayeri then asked whether she could consult with her husband, but the agents advised her that she could only speak with an attorney "during this period." (Gov. Ex. 3 at 43:55-44:05). She said that "for example," she may want to have his attorney, and the agents advised her that it was "up to [her]" and "nobody else." (Gov. Ex. 3 at 44:05-44:11). The agents told her to ask herself if she wanted an attorney now or not, but that the choice was hers, and she responded, "which one? I don't know." (Gov. Ex. 3 at 44:14-44:20). The agents again reiterated that they could not give her advice, and she said, "go ahead" and she continued to speak with the agents. (Gov. Ex. 3 at 44:21-44:50).

The interview lasted approximately one hour and thirty minutes, and the audio recording demonstrates that the tone of the interview was conversational. (Gov. Ex. 3). Jazayeri appeared to have no difficulty understanding English,

provided responsive answers in English, did not appear to be under the influence of alcohol or drugs, and was not physically restrained in any way. (Tr. at 22, 25, 30, 49-50, 54; Gov. Ex. 3). Aside from advising Jazayeri that they would make her cooperation known to the prosecutors and the judge, the agents made no promises to Jazayeri, nor did they threaten or coerce her in any way. (Tr. at 25-26, 37, 50; Gov. Ex. 3). At the conclusion of the interview, Jazayeri began crying as the agents handcuffed her and placed her under arrest. (Tr. at 27, 30; Gov. Ex. 3 at 1:23:34-1:25:59). Jazayeri now moves to suppress the statements she made at the airport on September 6, 2016, and during the interview at her residence upon the execution of the arrest warrant on November 5, 2018, [Docs. 86 & 114], which the government opposes, [Doc. 116].

**2**.   **Legal Analysis**

   **a.**   *September 6, 2016, Airport Statements*

The ruling in <u>Miranda</u> requires law enforcement officers to apprise a defendant in custody of her Fifth Amendment rights before engaging in interrogation. <u>See</u> <u>Garcia v. Singletary</u>, 13 F.3d 1487, 1489 (11th Cir. 1994). Interrogation for <u>Miranda</u> purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the

suspect.'" United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).  "Statements made in violation of *Miranda* are not admissible at trial." United States v. Barry, 479 F. App'x 297, 299 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted).

The agents' questioning of Jazayeri at the airport on September 6, 2016, clearly constituted interrogation, but the parties dispute whether she was in custody for *Miranda* purposes at the time of the interview.  See [Doc. 114 at 5-6; Doc. 116 at 8-14].  A defendant is in custody under Miranda when there has been a "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"[20] United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation

---

[20] Jazayeri argues that she was in custody for purposes of Miranda because a reasonable person in her situation would not have felt free to leave, see [Doc. 114 at 5-6], but the "Supreme Court [has] clarified 'that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody,'" United States v. Parker, Criminal Case No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758, at *8 (N.D. Ga. Nov. 18, 2010), adopted by 2010 WL 5313449, at *1 (N.D. Ga. Dec. 17, 2010) (quoting Maryland v. Shatzer, 559 U.S. 98, 112 (2010)).  In other words, "'a free-to-leave inquiry reveals *only* whether the person in question was seized.'  While 'seizure is a necessary prerequisite to *Miranda*, . . . a court must [also] ask whether . . . a reasonable person would have understood [her] freedom of action to have been curtailed *to a degree associated with formal arrest.*'" United States v. Luca-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (all but last alteration in original) (citations omitted); see also United States v. McGhee, CRIMINAL CASE NO.: 1:16-cr-00015-25-AT-JSA, 2016 WL 8857016, at *3 (N.D. Ga. Nov. 10, 2016), adopted by 2017 WL 1745055, at *1 (N.D. Ga. May 2, 2017).  Thus, "the standards are different," and a person is in custody for Miranda purposes only where there is a "restraint on freedom of movement to the degree associated with a formal arrest." United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006) (citation and internal marks omitted); see also United

omitted) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)).  However, "[a]n interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation." <u>United States v. Matcovich</u>, 522 F. App'x 850, 851 (11th Cir. 2013) (per curiam) (unpublished) (quoting <u>United States v. Muegge</u>, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam)); <u>see also</u> <u>United States v. Phillips</u>, 812 F.2d 1355, 1360 (11th Cir. 1987) (per curiam) (citation omitted) (quoting <u>Minnesota v. Murphy</u>, 465 U.S. 420, 431 (1984)) ("'[T]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings[.]'").  Instead, whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable [person] in [her] position would feel a restraint on [her] freedom of movement to such extent that [s]he would not feel free to leave." <u>Barry</u>, 479 F. App'x at 299 (quoting <u>Brown</u>, 441 F.3d at 1347).  This test is objective, and "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." <u>Brown</u>, 441 F.3d at 1347 (citation and internal marks omitted).  Thus, "[t]he 'initial step' in determining whether a person was in 'custody' under *Miranda*

---

States v. Dix, Criminal Case No. 3:12–cr–00007–TCB–RGV, 2013 WL 610219, at *3 n.15 (N.D. Ga. Jan. 29, 2013), adopted by 2013 WL 609458, at *1 (N.D. Ga. Feb. 19, 2013) (citation and internal marks omitted) ("Custody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment.").

'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that [s]he . . . was not at liberty to terminate the interrogation and leave.'" <u>Matcovich</u>, 522 F. App'x at 851 (quoting <u>Howes v. Fields</u>, 132 S. Ct. 1181, 1189 (2012)). "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." <u>Street</u>, 472 F.3d at 1309 (internal marks omitted) (quoting <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996)).

The Court must "consider several factors in determining custody, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" <u>Barry</u>, 479 F. App'x at 299 (quoting <u>Street</u>, 472 F.3d at 1309). And, "the court's determination whether interrogation is custodial should be interpreted in the light of the strong governmental interest in controlling the borders." <u>United States v. Santos</u>, Criminal Case No. 1:10–CR–0330–TWT–JFK, 2011 WL 336535, at *4 (N.D. Ga. Jan. 7, 2011), adopted by 2011 WL 336475, at *1 (N.D. Ga. Feb. 1, 2011) (citations and internal marks omitted); <u>see also</u> <u>United States v. Sanyaolu</u>, 1:16-cr-00126-WSD, 2016 WL 7111910, at *6 (N.D. Ga. Dec. 7, 2016) (citations omitted) (explaining that the determination of whether a person is in custody for the purpose of <u>Miranda</u> is "subject to the public policy concerns that undergird our laws governing border security, including airports which are the functional equivalent of our borders").

"Other factors include the duration of the questioning, statements made during the interview, the presence of physical restraints during questioning, and the release of the interviewee at the end of the questioning[.]" <u>United States v. Young</u>, CRIMINAL CASE NO. 3:16-cr-00006-TCB-RGV, 2017 WL 653556, at *3 (N.D. Ga. Jan. 25, 2017), adopted by 2017 WL 635120, at *1 (N.D. Ga. Feb. 16, 2017) (alteration in original) (footnote, citation, and internal marks omitted). "The defendant bears the burden of demonstrating that she was subjected to custodial interrogation." <u>Badiki</u>, 2018 WL 7283636, at *7 (citations omitted).

Applying these factors to the interview of September 6, 2016, the Court finds that Jazayeri was not in custody for purposes of <u>Miranda</u>. Indeed, "every factor that courts have considered in a custody analysis point away from a finding of custody." <u>Id.</u> The CBP officer, who had border search authority that included the authority to search and conduct interviews, along with BIS Agent Conley, who also had border search authority,[21] and an FBI agent, approached Jazayeri on the jetway and asked for her passport and for her to follow the agents to an interview room attached to the jetway. (Tr. at 3-6, 9-10, 39-40). Once inside the interview room, the agents

---

[21] "[T]he rationale applied to border searches under the fourth amendment encompasses persons exiting as well as persons entering our borders." <u>United States v. Berisha</u>, 925 F.2d 791, 795 (5th Cir. 1991) (footnote omitted); <u>see also</u> <u>United States v. Duncan</u>, 693 F.2d 971, 977 (9th Cir. 1982) (citations omitted) ("[A] person leaving the United States may be stopped and searched, without probable cause or any suspicion, pursuant to border search principles.").

asked routine questions about her travel arrangements, the purpose of her trip, and whether she had any checked baggage, and then asked whether she was transporting any medical or research items outside of the United States. (Tr. at 10-11, 40-41). After Jazayeri stated that she was not taking any such items with her, the interview, which lasted a short duration of less than ten minutes, was terminated and Jazayeri was allowed to board the flight with her minor son as planned. (Tr. at 11-12, 14); see also Badiki, 2018 WL 7283636, at *7 (citations omitted) (finding questioning that lasted two hours did not constitute a custodial interrogation for purposes of Miranda). During this interview, Jazayeri was not handcuffed or restrained in any way, and no promises or threats were made, with Jazayeri maintaining a "relaxed" demeanor for the duration of the questioning. (Tr. at 13-14, 34-35, 40).

Although Jazayeri may not have been free to leave at that time, she "never attempted to leave and was not told that [s]he was not free to leave." United States v. Willoughby, CRIMINAL CASE NO. 1:11-CR-0280-CAP-JFK, 2011 WL 13136957, at *3 (N.D. Ga. Oct. 21, 2011) (citation omitted); see also (Tr. at 13, 34-35, 40). In fact, "every traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border, a reasonable traveler will expect some constraints as well as questions and follow-up about . . . her citizenship, authorization to enter the country, destination, baggage, and so on," and "similar

expectation[s] attach[] to an individual departing from a United States airport as well." United States v. Soto, No. 13-CR-76 (MKB), 2014 WL 3695990, at *4 (E.D.N.Y. July 24, 2014) (emphasis, citations, and internal marks omitted).  With this in mind, "the likelihood that a reasonable person being questioned by CBP officers on a jetway would consider . . . herself under arrest is diminished[.]"  Id. (citation omitted).  Furthermore, the agents did not advise Jazayeri that she was suspected of committing a crime at the time of this interview, nor did they accuse her of lying, and "when the defendant is not told that [she] is the suspect of a crime, courts are less likely to find a custodial interrogation."  United States v. Rahim, 382 F. Supp. 3d 561, 571 (N.D. Tex. 2019) (citation omitted).

The Court is simply not persuaded that the circumstances of Jazayeri's interview "present[ed] the same inherently coercive pressures as the type of station house questioning at issue in Miranda."  United States v. Peck, 17 F. Supp. 3d 1345, 1359 (N.D. Ga. 2014) (citation omitted); see also United States v. Wallraff, 705 F.2d 980, 992 (8th Cir. 1983) (citation and internal marks omitted) (noting that "most of the questioning of the defendant by [the] agents . . . took place near the [airport] terminal exit, which [was] hardly the type of police-dominated surrounding that concerned the Miranda Court"); Willoughby, 2011 WL 13136957, at *9-10 (finding defendant was not in custody when questioned at the airport since he was not

physically restrained during the interview, no handcuffs were employed or guns drawn, he was not booked or told he was under arrest, he did not ask to leave and was not told that he was not free to do so, he made no admissions during the interview, and he was released after three to three and a half hours after exiting the plane).  Nor does the mere fact that Jazayeri may have been temporarily detained convert the interview into a full-blown custodial interrogation.  See United States v. Charles, Criminal Indictment No. 1:09–CR–386–TWT, 2010 WL 989937, at *3 (N.D. Ga. Feb. 16, 2010), adopted by 2010 WL 989936, at *1 (N.D. Ga. Mar. 15, 2010) (citation omitted) (finding that the detention on the jetway at the airport did not "convert the officer's questioning of [defendant] into a custodial interrogation that require[d] Miranda warnings," especially since defendant "had not been touched or told that he was under arrest").[22]  In sum, because Jazayeri was not subject to

---

[22] To the extent Jazayeri contends that "because she was a person of interest . . . and was actively sought out from amongst the passengers boarding the plane, the jetway questioning was not a routine outbound [] examination but a 'ruse' meant to elicit an incriminating statement," the "existence or non-existence of probable cause might be one factor to consider in determining someone's custodial status in the twilight zone between detention and custody, [but] what ultimately matters to the determination of whether Miranda is triggered is custody, which is determined not by the existence of probable cause, but by looking to the objective circumstances of the interrogation."  Soto, 2014 WL 3695990, at *5 (citations and internal marks omitted); see also [Doc. 114 at 6 (Jazayeri's argument that the "encounter was pre-planned and designed by law enforcement to elicit information from [her] in furtherance of an investigation")].  Here, "under the totality of the circumstances, the Court finds that [Jazayeri] was not in 'custody' and therefore, no Miranda warnings were required[.]" Soto, 2014 WL 3695990, at *6; see also United States v.

custodial interrogation when the agents spoke with her at the airport on September 6, 2016, <u>Miranda</u> warnings were not required.[23]  The statements were not obtained in violation of <u>Miranda</u>, and they are not due to be suppressed on that basis.  <u>See</u> <u>United States v. Harder</u>, 180 F. Supp. 3d 355, 364 (E.D. Pa. 2016).

---

<u>Vallerius</u>, CASE NO. 17-CR-20648-SCOLA/TORRES, 2018 WL 2325729, at *5 (S.D. Fla. May 1, 2018), adopted by 2018 WL 2324059, at *1 (S.D. Fla. May 22, 2018) (citation omitted) (finding that <u>Miranda</u> warnings were not required during the initial interview because defendant was not in custody and rejecting defendant's arguments regarding pretext, explaining that "it made no difference that the suspect had been the subject of a prior FBI investigation," since only "the circumstances surrounding the interrogation–not the fact that the suspect was being investigated for his links to terrorist organizations–[were relevant] in [] determin[ing] whether the interrogation became custodial").

[23] However, even if Jazayeri "was in custody when she was questioned by [the agents], the Court concludes that [the agents were] not required to provide *Miranda* warnings before questioning [her]."  <u>United States v. Thomas-Okeke</u>, Criminal Action No. 2018-0008, 2019 WL 2344772, at *12 (D.V.I. June 3, 2019) (footnote omitted).  The CBP agent "posed [] questions to [Jazayeri] in what [was] reasonably believed to be a unique border context where normal *Miranda* rules simply cannot apply[.]"  <u>Id.</u> (citation and internal marks omitted).  Under these circumstances, "there was simply an overlap between questions relevant to [the CBP agent's] [] duties and questions relevant to possible criminal conduct, [but] the questions did not cross the line, and no *Miranda* warnings were required."  <u>Id.</u> (citations omitted); <u>see also</u> <u>id.</u> at *13 (citations and internal marks omitted) (explaining that even though the officer "had reason to suspect Defendant's involvement in criminal activity before she questioned Defendant," this "fact [was] not dispositive" and "a mere overlap between questions relating to admissibility of persons or effects and questions relating to criminal activity does not trigger the need for *Miranda* warnings").  "In short, because the routine customs questions asked by [the CBP agent] were objectively relevant to [] customs inspection, []he was not required to provide [Jazayeri] with *Miranda* warnings before questioning her."  <u>Id.</u> at *13.

### b.   *November 5, 2018, Post-Arrest Statements*

Jazayeri also moves to suppress statements she made following her arrest on November 5, 2018.  [Doc. 114 at 6-10].  In particular, Jazayeri asserts that since the government does not dispute that this interview was custodial, "the issues are whether [she] knowingly and voluntarily waived her rights and whether law enforcement violated her rights when they continued questioning her after she requested counsel."  [Id. at 6].  The government responds that Jazayeri voluntarily, knowingly, and intelligently waived her Miranda rights and that her post-arrest statements were voluntary.  [Doc. 116 at 14-18].  In addition, the government asserts that Jazayeri did not unambiguously request counsel during the course of the interview.  [Id. at 18-22].  The Court will address each of these arguments.

Statements made in response to custodial interrogation are admissible only if the defendant was informed of her Miranda rights and waived them.  The government bears the burden of proving by a preponderance of evidence that Jazayeri validly waived her Miranda rights.  United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997) (citation omitted); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986) (citations omitted).  In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel [her] to speak where

48

[s]he would not otherwise do so freely."  384 U.S. at 467.  Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures law enforcement must follow. Specifically, prior to the initiation of custodial questioning, law enforcement must fully advise the suspect of the government's intention to use her statements to secure a conviction, and must inform her of her rights to remain silent and to "have counsel present . . . if [she] so desires."  Id. at 468-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise her rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that [s]he wishes to remain silent, the interrogation must cease."  Id. at 473-74 (footnote omitted).  "If the individual states that [s]he wants an attorney, the interrogation must cease until an attorney is present."  Id. at 474.

A defendant may waive her rights under Miranda if the waiver is made knowingly, intelligently, and voluntarily.  Id. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of

comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted); Edwards v. Arizona, 451 U.S. 477, 482 (1981) (citations omitted); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived [her] rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver. United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002) (citation omitted). To find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167.

Agents Conley and Martin testified, and the audio recording confirms, that Jazayeri knowingly, voluntarily, and intelligently waived her rights and agreed to speak with them during the interview. See (Gov. Ex. 3). Agent Leiwand read Jazayeri her Miranda warnings in English from an Advice of Rights form and provided the form printed in both English and Farsi for Jazayeri to read. (Tr. at 18,

20-21, 29, 31, 35-36, 43-44, 48-49; Gov. Exs. 1 & 2; Gov. Ex. 3 at 1:25-1:59). Jazayeri verbally affirmed that she understood her rights and signed the form, indicating that she had been provided her rights and that she understood them and wished to waive her rights and speak with the agents. (Tr. at 20-21, 48-49; Gov. Exs. 1 & 2; Gov. Ex. 3 at 3:39-4:10, 4:47-7:05). Jazayeri did not appear to have any difficulty understanding English, but in fact, "spoke English well," as demonstrated by the audio recording, and she provided answers responsive to the questions asked and stated that she had been in the United States since 2002 or 2003, had obtained a post-doctoral fellowship at a university in Kentucky in 2010, and was a United States citizen. (Tr. at 49-50; Gov. Ex. 3). After Jazayeri waived her rights, the agents proceeded to question her, and Jazayeri then made certain incriminating statements that she now moves to suppress. (Tr. at 18, 22, 49; Gov. Ex. 3).

To find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167. And, whether a suspect intelligently waived her rights depends on the particular circumstances in a case, including the background, experience, and conduct of the defendant; the defendant's age; familiarity with the criminal justice system; and her demeanor and conduct during the interrogation. See Edwards, 451 U.S. at 482 (citations omitted); Coleman v. Singletary, 30 F.3d 1420, 1426-27 (11th Cir. 1994). However, "[a] criminal suspect is

not required to know and understand every possible consequence of a waiver for it to be knowingly and intelligently made[;] it is enough if [s]he understands that [s]he may choose not to speak to law enforcement, speak only with counsel present, and to stop speaking at any time." United States v. Reilly, CR416-353-003, 2017 WL 3833859, at *2 (S.D. Ga. Aug. 4, 2017), adopted by 2017 WL 3726723, at *1 (S.D. Ga. Aug. 29, 2017) (second alteration in original) (citation and internal marks omitted).

Here, there is no evidence in the record of any unlawful coercion of Jazayeri during her interview.  The interview, which occurred in the dining room of Jazayeri's home, was conducted in a conversational tone, with the agents never raising their voices or displaying their firearms, which remained holstered after the initial entry and protective sweep of the residence, while Jazayeri remained unrestrained and free from any physical force or threats.  See (Tr. at 22, 25-26, 30, 37, 49-50, 54; Gov. Ex. 3).  Moreover, Jazayeri, is an adult, who acknowledged that she could read and write the English language and appeared to understand what the agents discussed with her, was attentive during the interview, asked clarifying questions, and answered the agents' questions in a coherent manner.  (Tr. at 22, 25, 30, 49-50, 54; Gov. Ex. 3).  Jazayeri did not ask to stop the interview or refuse to answer questions, nor did she otherwise indicate that she did not understand her rights or the consequences of her waiver.  See (Gov. Ex. 3).  Accordingly, the totality

of the circumstances demonstrate that Jazayeri voluntarily, knowingly, and intelligently waived her rights.  See United States v. Vanbrackle, 397 F. App'x 557, 562-63 (11th Cir. 2010) (per curiam) (unpublished) (finding defendant voluntarily, knowingly, and intelligently waived his Miranda rights, despite the presence of eight law enforcement officers during the execution of a search warrant, some of whom had their firearms drawn upon entry in defendant's residence, but not during the interview, since the officers did not threaten defendant, who had a college education, to induce him to speak, nor was the defendant handcuffed during the interview, which took place in his home after he had been advised of his rights and the nature of the investigation and signed a waiver); see also United States v. Pichardo, 659 F. App'x 603, 605 (11th Cir. 2016) (per curiam) (unpublished) (affirming district court's ruling that defendant knowingly and voluntarily waived his Miranda rights where record showed that he was arrested at his home while his children were present, he had time to review the "waiver form that explained his rights in detail," there was no evidence that he was coerced into waiving his rights, and he was not handcuffed when he reviewed and signed the form).

Although the evidence shows that Jazayeri was informed of and waived her right to counsel by consenting to speak with the law enforcement agents, Jazayeri argues that she invoked her right to counsel, and that any statements made after she

invoked her right should be suppressed.  [Doc. 114 at 8-10].  Specifically, Jazayeri contends that she "expressed a clear and unambiguous desire to have counsel assist her during the interview," but that "the agents induced her to continue talking to them without counsel after she requested an attorney to be present during the interview" and "gave [her] conflicting information regarding her rights, including that the agents could provide an attorney for her here right now, before Agent Conley jumped in and told [her] that she could either terminate the interview by requesting an attorney or continue talking without an attorney and get credit for cooperation." [Id. at 8-9 (internal marks omitted)].  Jazayeri contends that once she "requested an attorney, the agents should have ceased the interview," instead of "advis[ing] her that continuing to talk to them would be beneficial to her," and that her statements made after invoking her right to counsel should be suppressed.  [Id. at 9-10].  The Court disagrees.

"If the suspect effectively waives [her] right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question [her]," but "if a suspect requests counsel at any time during the interview, [s]he is not subject to further questioning until a lawyer has been made available or the suspect [herself] reinitiates conversation." Davis v. United States, 512 U.S. 452, 458 (1994) (citation omitted) (citing Edwards, 451 U.S. at 484-85).  Courts have to "determine whether

the accused *actually invoked* [her] right to counsel," which is an objective inquiry. United States v. Gonzalez-Delgado, 4:16-cr-259-AKK-TMP, 2017 WL 874571, at *3 (N.D. Ala. Feb. 7, 2017), adopted by 2017 WL 840591, at *1 (N.D. Ala. Mar. 3, 2017) (citations and internal marks omitted) (quoting Davis, 512 US. 458-59); see also Ford v. Schofield, 488 F. Supp. 2d 1258, 1290 (N.D. Ga. 2007), aff'd sub nom., Ford v. Hall, 546 F.3d 1326 (11th Cir. 2008) (citation omitted).  "Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Gonzalez-Delgado, 2017 WL 874571, at *3 (citation and internal marks omitted) (quoting Davis, 512 US. 458-59).  That is, "[t]he suspect's request for counsel must be unambiguous and unequivocal."  United States v. Propst, 369 F. App'x 42, 46 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted) (citing Davis, 512 U.S. at 452)  If a suspect "makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke [her] . . . *Miranda* rights." United States v. Thomas, Criminal Action No. 4:13-CR-22-RLV, 2014 WL 793359, at *7 (N.D. Ga. Feb. 25, 2014), aff'd, 621 F. App'x 618 (11th Cir. 2015) (per curiam) (unpublished) (internal marks omitted) (quoting Berghuis v. Thompkins, 560 U.S. 370, 381 (2010)).

Jazayeri asserts that she clearly and unambiguously expressed a desire for a lawyer during the interview.  [Doc. 114 at 9].  However, as the government points out, "[t]he recording clearly establishes that Jazayeri never made an unambiguous and unequivocal request for an attorney."  [Doc. 116 at 20].  Instead, about forty-one minutes into the interview, Jazayeri asked for clarification about her right to counsel and asked whether she should have one present, at which time, the agents advised her that it was entirely her decision and her right to have one present and that the agents could get her an attorney, but that they would then have to stop speaking with her or she could continue to speak with the agents and her cooperation would be made known to the prosecutors and the judge.  (Tr. at 22-24, 35-36, 51-52, 54-56; Gov. Ex. 3 at 41:36-43:39).  Jazayeri's question about whether she should have an attorney present "is at best an ambiguous request to speak to counsel," United States v. Creech, 52 F. Supp. 2d 1221, 1232 (D. Kan. 1998), aff'd, 221 F.3d 1353 (10th Cir. 2000) (unpublished) (citation omitted), which was subsequently clarified by the agents when they asked Jazayeri whether she wished to continue with the interview without an attorney, and she responded affirmatively and said that she had "nothing to hide," and thus, the agents were not required to stop questioning her, (Tr. at 24-25, 52; Gov. Ex. 3 at 43:40-43:48); see also Davis, 512 U.S. at 461 ("Unless the suspect actually requests an attorney, questioning may continue.").

Thereafter, Jazayeri asked if she could consult with her husband, and the agents again reiterated that she could only speak with an attorney "during this period," and that it was up to her and no one else as to whether she wanted an attorney, but that they could not give her advice, and she said, "go ahead" and continued to speak with the agents. (Gov. Ex. 3 at 43:55-44:50). As the government correctly contends, [Doc. 116 at 18], "[t]his is the sort of equivocation or ambiguity that falls short of an affirmative invocation of the right to counsel under Davis," Gonzalez-Delgado, 2017 WL 874571, at *4; see also Davis, 512 U.S. at 459-62 (holding that "[m]aybe I should talk to a lawyer" was not an unambiguous invocation of the right to counsel); United States v. Peters, 435 F.3d 746, 751-52 (7th Cir. 2006) (observing that circuits have held that a statement such as "I might want to talk to an attorney" or "[d]o you think I need a lawyer?" or a request to call someone about possible representation is too ambiguous to constitute invocation of right to counsel); Soffar v. Cockrell, 300 F.3d 588, 595 (5th Cir. 2002) (finding defendant did not unequivocally invoke his right to counsel when he asked the officer whether he should get an attorney, how he could obtain one, and how long it would take to have an attorney appointed); Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001) (holding that "could I call my lawyer" was not unequivocal); United States v. Zamora, 222 F.3d 756, 766 (10th Cir. 2000) (finding the statement "I might want to

talk to an attorney" was not "an unequivocal request for counsel"); <u>Mincey v. Head</u>, 206 F.3d 1106, 1132 (11th Cir. 2000) (citation omitted) (finding defendant's statement "'go ahead and run the lawyers'" did not "constitute[] an 'unambiguous or unequivocal request for counsel'"); <u>Diaz v. Senkowski</u>, 76 F.3d 61, 63-66 (2d Cir. 1996) (finding continued questioning was permissible because defendant's question, "Do you think I need a lawyer?" was not a clear, unambiguous invocation of his right to counsel); <u>United States v. Clark</u>, 746 F. Supp. 2d 176, 179, 185 (D. Me. 2010) (finding defendant did not unambiguously invoke his right to counsel where he said, "I guess this is where I have to stop and ask for a lawyer, I guess"); <u>Fraher v. Patrick</u>, No. EDCV 06-1406-SVW (AGR), 2010 WL 532397, at *17 (C.D. Cal. Feb. 9, 2010) (concluding suspect did not "clearly assert her right to have counsel present" where she said, "Yes, I would like attorney I guess," which, after clarification by the officer, was followed by "[w]ell I'll tell you what I know"); <u>United States v. Ortiz</u>, 499 F. Supp. 2d 224, 232 (E.D.N.Y. 2007) (finding statement that defendant "thinks he wants to speak to a lawyer" insufficient to invoke Fifth Amendment rights); <u>United States v. Ramirez,</u> No. CR02–3008MWB, 2002 WL 31933026, at *7-8 (S.D. Iowa Apr. 16, 2002) (finding defendant's initial question to the officer about whether he should speak with an attorney was not an unambiguous request to speak to an attorney, especially in light of the fact that the officer responded by "telling him it

was entirely his choice and they would provide an attorney if he wanted one," but he did not "ask for an attorney when [the officer] offered him the opportunity").[24] Moreover, after Jazayeri made the above statements, the agents reiterated her right to counsel and that it was her decision, and Jazayeri indicated her willingness to continue the interview without a lawyer.  (Gov. Ex. 3 at 43:38-44:50); see also Gonzalez-Delgado, 2017 WL 874571, at *4 (finding the equivocation of defendant's statement was underscored by the fact that he thereafter indicated his willingness to deal with the police unassisted).  Thus, because Jazayeri's statements were made voluntarily and in conformity with the dictates of Miranda, and she did not make an unequivocal or unambiguous statement invoking her right to counsel, her

---

[24] Relying on Gomez, 927 F.2d at 1530, Jazayeri maintains that she unequivocally requested the presence of an attorney and that the agents were therefore required to cease questioning her.  [Doc. 114 at 9].  However, the circumstances in Gomez are readily distinguishable, since upon his arrest, the defendant in Gomez clearly stated that "he was unwilling to cooperate and requested an attorney," and the government did not challenge whether his request was unambiguous.  Gomez, 927 F.2d at 1533, 1537-39.  After his request for an attorney, law enforcement advised the defendant that he faced anywhere from ten years to life in prison and that the only way he could receive a lighter sentence was by cooperating. Id. at 1533.  Minutes later, the defendant asked to speak to someone about cooperating.  Id.  Here, as discussed, the record does not establish that Jazayeri unequivocally invoked her right to counsel at any time during the interview, (Gov. Ex. 3), and "Eleventh Circuit case law is clear: [a] statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial [or prosecuting] authorities and would probably be helpful to [her] is not a sufficient inducement so as to render a subsequent incriminating statement involuntary," Patterson, 2007 WL 2331080, at *4 (second alteration in original) (citations and internal marks omitted).

statements on November 5, 2018, are not due to be suppressed.  See United States

v. Grant, Criminal Action No. 1:09–CR–482–TWT–LTW, 2011 WL 2580867, at *7

(N.D. Ga. May 4, 2011), adopted by 2011 WL 2580779 (N.D. Ga. June 29, 2011), aff'd,

521 F. App'x 841 (11th Cir. 2013) (unpublished).  It is, therefore, **RECOMMENDED**

that Jazayeri's motion to suppress statements, [Doc. 86], be **DENIED**.

### III.   CONCLUSION

For the foregoing reasons and cited authority, defendants' motions to adopt,

[Docs. 94, 107, 110, & 112], are **GRANTED**, and it is **RECOMMENDED** that Jazayeri

and Ghaedi's motions to sever, [Docs. 92 & 93], defendants' motions to dismiss,

[Docs. 77, 87, & 88], and Jazayeri's motion to suppress statements, [Doc. 86], be

**DENIED**.

There are no other pending matters before the Magistrate Judge, and the

undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the

same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 25th day of September,

2019.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

60